## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE HERSHEY COMPANY and HERSHEY CHOCOLATE & CONFECTIONERY CORPORATION, | : : : : | Civil Action No. _____ |
| Plaintiffs, | : : | |
| v. | : : | |
| LBB IMPORTS, LLC, | : : | JURY TRIAL DEMANDED |
| Defendant. | : : : | |

## <u>COMPLAINT</u>

Plaintiffs The Hershey Company ("Hershey Company") and Hershey Chocolate & Confectionery Corporation ("Hershey Chocolate") (together, "Hershey"), for their complaint against defendant LBB Imports, LLC ("LBB") for trademark and trade dress infringement, trademark and trade dress dilution, false designation of origin, unfair competition and breach of contract, plead and allege as follows:

1.      LBB imports candy products that are manufactured outside of the United States, including TOFFEE CRISP, YORKIE, MALTESERS, CADBURY, KIT KAT and ROLO chocolate, candy and confectionery products (collectively, the "Infringing Products").  By selling these products in the United States, LBB violates trademark rights that are owned or licensed by Hershey.  In particular, the imported TOFFEE CRISP product sold by LBB closely resembles the well-known

REESE'S trade dress that is protected by a number of federal trademark registrations:  among other things, both have the same orange background color, and both feature a slanted yellow font with brown outlining.  In addition, the Infringing Products sold by LBB violate Hershey's rights in the United States in the YORK, MALTESER, CADBURY, KIT KAT and ROLO trademarks.  What is more, defendant continues to import and sell the Infringing Products, despite previously admitting that its actions infringed Hershey's trademark rights and repeatedly agreeing to stop its infringing conduct.  Hershey brings this suit to prevent LBB from continuing to breach its agreements and to violate Hershey's acknowledged trademark rights.

## NATURE AND BASIS OF THE ACTION

2.     This action is brought by Hershey against LBB under the Lanham Act, 15 U.S.C. §§ 1051 *et seq*., and state law, seeking preliminary and permanent injunctive relief, disgorgement of profits, compensatory damages, punitive damages and other relief relating to defendant's importation, distribution and sale of products that infringe and dilute certain well-known trademarks owned or licensed by Hershey, namely, the REESE'S trade dress, the YORK trademark, the MALTESER trademark, the CADBURY trademark and trade dress and the KIT KAT trademark and trade dress, and the ROLO trademark and trade dress, (collectively, the "Hershey Marks").

3.     Hershey is a leading manufacturer of chocolate and confectionery products in the United States and worldwide.  For many years, Hershey has manufactured and sold REESE'S, YORK, MALTESER, CADBURY, KIT KAT and ROLO branded candies and confections, among other products.

4.     As set forth more fully below, Hershey owns or licenses the exclusive rights to use the Hershey Marks in connection with various chocolate and confectionery products in the United States.  Notwithstanding those exclusive rights, defendant imports into the United States, offers for sale, and sells within the United States the Infringing Products, none of which are made or authorized by Hershey:

- TOFFEE CRISP brand confectionery products in a trade dress that infringes and dilutes the famous REESE'S trade dress;

- YORKIE brand confections that infringe and dilute the famous YORK trademark;

- MALTESERS brand confections that infringe Hershey's MALTESER trademark;

- CADBURY brand chocolate products that infringe the CADBURY trademark and trade dress;

- KIT KAT brand confections that infringe the KIT KAT trademark and trade dress; and

- ROLO brand confections that infringe and dilute the famous ROLO trademark and trade dress.

5.     On information and belief, defendant offers its Infringing Products for sale to customers throughout the United States through its offices in California,

New Jersey and New York.  On information and belief, defendant also advertises and sells the Infringing Products through its website (www.lbbimports.com).

6.      Unless such acts of trademark and trade dress infringement, trademark and trade dress dilution, false designation of origin, unfair competition and breach of contract are enjoined, Hershey will suffer irreparable injury for which there is no adequate remedy at law.

**PARTIES**

7.      Hershey Company is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 100 Crystal A Drive, Hershey, Pennsylvania 17033.  Hershey Company is a major manufacturer and seller of chocolate, confectionery and snack products.  Hershey Company is the exclusive United States licensee of the YORK trademark, the CADBURY trademark and trade dress, and the KIT KAT trademark and trade dress, and the ROLO trademark and trade dress with respect to the products at issue in this lawsuit.

8.      Hershey Chocolate is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 4860 Robb Street, Wheat Ridge, Colorado 80033.  Hershey Chocolate is a wholly owned subsidiary of Hershey Company and is the owner of the REESE'S trade dress and the MALTESER trademark.

9.     On information and belief, defendant LBB is a limited liability company organized and existing under the laws of the State of New Jersey, with places of business at 720 Melrose Avenue, Los Angeles, California 90019 and 201 Penhorn Avenue, Secaucus, New Jersey 07094.  On information and belief, LBB is engaged in the business of importing, distributing and selling a wide range of products throughout the United States, including the Infringing Products at issue in this lawsuit.

## JURISDICTION AND VENUE

10.     The Court has subject matter jurisdiction over Hershey's federal-law claims for trademark and trade dress infringement, trademark and trade dress dilution, false designation of origin, and unfair competition claims under Section 39 of the Lanham Act, 15 U.S.C. § 1121, and under 28 U.S.C. §§ 1331 and 1338(a) & (b).  The Court has subject matter jurisdiction over Hershey's state-law claims under 28 U.S.C. § 1367 and, because the amount in controversy exceeds $75,000 exclusive of interest and costs and there is complete diversity of citizenship, under 28 U.S.C. § 1332.

11.     The Court has personal jurisdiction over defendant because, upon information and belief, defendant is present and doing business in the State of Pennsylvania and this judicial district either directly or through its agents, and has distributed its Infringing Products to persons in, and offered its Infringing Products

for sale in, the State of Pennsylvania and this judicial district.

12.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391 because defendant is subject to personal jurisdiction in this judicial district and because a substantial part of the events giving rise to plaintiffs' claims occurred in this judicial district.

## ALLEGATIONS COMMON TO ALL CLAIMS

### Hershey's Federally Registered and Famous
### REESE'S Orange Mark and REESE'S Trade Dress

13.     Among Hershey's most successful product lines is the REESE'S family of candy products, first introduced in 1928.  For more than 40 years, Hershey's REESE'S products have been sold throughout the United States in packaging that features a distinctive orange background color and a distinctive combination of orange, yellow and brown elements.

14.     Hershey Chocolate owns an incontestable, valid, subsisting and existing federal trademark registration (No. 2,256,226) consisting of an "orange-colored background covering the entirety of the packaging for the goods," for "candy and confectionery chips for baking with peanut butter as the characterizing flavor or one of various characterizing flavors" (the "REESE'S Orange Mark").  A copy of the certificate of registration for the REESE'S Orange Mark is attached as **Exhibit A**.

15.     Hershey's REESE'S brand candy products have also been widely

advertised and sold throughout the United States for many years in packaging that features a unique combination of orange, brown and yellow elements (including the orange background of the REESE'S Orange Mark, with prominent yellow type with dark outlining). These elements are the subject of an incontestable, valid, subsisting and existing federal trademark registration (No. 925,609) owned by Hershey Chocolate for the mark REESE'S MILK CHOCOLATE PEANUT BUTTER CUPS and Design (the "REESE'S Trade Dress"). A copy of the certificate of registration for the REESE'S Trade Dress is attached as **Exhibit B**.

16.     The REESE'S family of products includes the famous REESE'S Peanut Butter Cup, REESE'S Peanut Butter Cup Miniatures, REESE'S PIECES candies, REESE'S WHIPPS, REESE'S Crispy Crunchy, REESE'S FAST BREAK, REESE'S Sticks and REESE'S BIG CUP, all of which are examples of how Hershey uses its distinctive REESE'S Orange Mark and its distinctive REESE'S Trade Dress on packages to immediately identify these candy products as part of the REESE'S family of products. Representative images of product packaging embodying the REESE'S Trade Dress and REESE'S Orange Mark are attached as **Exhibit C**.

17.     Hershey Chocolate also owns a number of valid, subsisting and existing federal trademark registrations for various iterations of packaging for its REESE'S brand line extensions, each of which claims a combination of orange,

yellow and brown as a feature of the mark.  Copies of the certificates of

registration for these designs are attached as **Exhibit D**.

18.     The distinctive REESE'S orange background color that comprises the

REESE'S Orange Mark is an arbitrary design element that is nonfunctional and

inherently distinctive.  Likewise, the REESE'S Trade Dress constitutes an arbitrary

combination of arbitrary design elements, the overall appearance and the elements

of which are nonfunctional and inherently distinctive.

19.     In addition, for many decades, the REESE'S Orange Mark and the

REESE'S Trade Dress have figured prominently in Hershey's promotion of the

REESE'S brand.  As early as the 1960s, Hershey used print advertising that alerted

consumers to "Look for REESE'S Peanut Butter Cups wherever candy is sold, in

the familiar orange wrapper" and to "Look for the bright orange pack."  Many of

Hershey's print ads for the REESE'S family of products are set against a field of

the unique REESE'S orange color used in the REESE'S packaging, with orange,

brown and yellow elements.  Other advertising and promotional materials for

REESE'S products also feature the bright REESE'S orange with elements of

orange, brown and yellow.  Hershey spends millions of dollars for advertising of

its REESE'S family of peanut butter products each year.

20.     Hershey's REESE'S Peanut Butter Cups is one of the most popular

candy bar products in the country, with sales of over $1 billion each year in the

United States alone in packaging bearing the REESE'S Orange Mark and the REESE'S Trade Dress.  In total, sales of the REESE'S family of products in the United States have exceeded $7 billion in the last five years alone.

21.    By virtue of Hershey's substantial sales, marketing and use of the REESE'S Orange Mark and the REESE'S Trade Dress throughout the United States in connection with the REESE'S family of products, the REESE'S Orange Mark and the REESE'S Trade Dress have become famous and well known, have become distinctive of Hershey's products, and have come to identify and indicate the source of Hershey's products to consumers and the trade.  Hershey has developed for itself and its REESE'S Orange Mark, REESE'S Trade Dress and REESE's family of products substantial goodwill and an excellent reputation among actual and potential purchasers and users of its products.

22.    In light of the distinctiveness of the REESE'S Orange Mark and the REESE'S Trade Dress and the duration and extent of Hershey's sales, marketing and use of this mark throughout the United States, the REESE'S Orange Mark and the REESE'S Trade Dress are distinctive and famous among consumers in the State of Pennsylvania and throughout the United States.

**Defendant's Infringement and Dilution of the REESE'S Orange Mark and the REESE'S Trade Dress**

23.    Well after Hershey first began using its REESE'S Orange Mark and the REESE'S Trade Dress for its candy products, and after those marks had

become famous, defendant commenced selling, in the United States, TOFFEE CRISP brand confectionery products that are manufactured for sale outside of the United States by entities other than Hershey and that are not authorized by Hershey for sale in the United States.

24.    The TOFFEE CRISP products sold by defendants use sold in a package design that is strikingly similar to the REESE'S Orange Mark and REESE'S Trade Dress.

25.    First, the predominant color on the TOFFEE CRISP package is a shade of orange that is identical or nearly identical to the shade of orange that is protected by the REESE'S Orange Mark and that Hershey uses in connection with its REESE'S family of products.

26.    Second, the name TOFFEE CRISP is displayed in an identical or nearly identical shade of yellow as Hershey uses on its REESE'S packaging for the words "Reese's," "Pieces," and "Big Cup," among others, and uses a slanted font similar to that of the REESE'S packaging.

27.    Third, the yellow TOFFEE CRISP text is surrounded by dark outlining that is nearly identical to the dark outlining that Hershey uses for yellow type on its REESE'S products.

28.    An image of a TOFFEE CRISP product of the type sold by defendant is set forth below, above an image of Hershey's REESE'S product:



**Example of infringing
TOFFEE CRISP products**

**Example of Hershey
REESE'S products**

29.     On information and belief, defendant imports its infringing TOFFEE

CRISP products into the United States and offers them for sale through, inter alia,

its sales offices and catalogs.  On information and belief, defendant also advertises

and sells its TOFFEE CRISP products through its website (www.lbbimports.com).

30.     The TOFFEE CRISP products that defendant sells in the United States

are not manufactured or authorized by Hershey.  Defendant has never been

authorized by Hershey or its affiliates to use the REESE'S Orange Mark or the

REESE'S Trade Dress, or any variants thereof, in connection with candy or any

other product.

31.     Given that the trade dress of the TOFFEE CRISP products sold by

defendant is extremely similar to Hershey's famous REESE'S Orange Mark and

famous REESE'S Trade Dress, and is used for confectionery products, defendant's

sale of TOFFEE CRISP products inevitably will cause confusion among

consumers as to the origin, source or sponsorship of defendant's TOFFEE CRISP products.

32.     In addition, the TOFFEE CRISP trade dress is likely to dilute the distinctive quality of the REESE'S Orange Mark and the REESE'S Trade Dress by lessening their capacity to identify and distinguish Hershey's products.

33.     Defendant's acts are causing and will continue to cause damage and irreparable harm to Hershey and the valuable reputation and goodwill of its marks with purchasers and consumers.

### Hershey's Exclusive Right to Use the YORK Mark

34.     The distinctive and famous YORK trademark has been used since the 1920s in connection with chocolate and confectionery products.  The well-known YORK peppermint patty was introduced in 1940.  For the last quarter-century, since 1988, YORK-branded products have been manufactured and distributed in the United States by Hershey Company.

35.     Hershey Company owns an exclusive license (even as to the licensor) to use the famous registered trademark YORK in connection with, *inter alia*, all food and food-related products in the United States.  Hershey Company's licensor, Kraft Foods Ireland Intellectual Property Limited ("Kraft"), owns two incontestable, valid, subsisting and existing United States trademark registrations for the YORK trademark (Nos. 564,557 and 1,644,557).  Copies of the certificates

12

for the foregoing federal registrations for the YORK mark are attached as

**Exhibit E**.

36.     The YORK mark has been extensively advertised and used throughout

the United States for decades.  Hershey Company has spent tens of millions of

dollars on advertising for YORK products.  Hershey's sells more than $100 million

of YORK products each year in the United States.

37.     Through substantial use, sales and promotion of products bearing the

YORK mark by Hershey and its licensor, the YORK mark has become extremely

well known and famous for use in connection with YORK confectionery products

licensed by Hershey, has become distinctive of these products and has come to

identify and indicate the source of these products to consumers and the trade.

38.     In light of the distinctiveness of the YORK mark, as well as the

duration and extent of Hershey's sales, marketing and use of the YORK mark

throughout the United States, the YORK mark is distinctive and famous among

consumers in the State of Pennsylvania and throughout the United States.

39.     Pursuant to the license agreement between Hershey Company and

Kraft's predecessor-in-interest, Cadbury Schweppes Inc., Hershey is expressly

authorized to file a lawsuit to protect the marks that it licenses from Kraft.

### Defendant's Infringement and Dilution of the YORK Mark

40.     Well after Hershey began using the YORK mark in the United States,

and after the YORK mark had become famous in the United States, defendant commenced selling in the United States YORKIE brand confectionery products that are manufactured for sale outside of the United States by entities other than Hershey and that are not authorized by Hershey for sale in the United States.

41.     On information and belief, defendant imports these infringing products into the United States and offers them for sale through, inter alia, its sales offices and catalogs.  On information and belief, defendant also advertises and sells its YORKIE products through its website (www.lbbimports.com).

42.     The YORKIE products that defendant sells in the United States are not manufactured or authorized by Hershey.  Defendant has never been authorized by Hershey or its affiliates to use the YORK mark, or any variant thereof, in connection with candy or any other product.

43.     Given that the YORKIE mark used by defendant is extremely similar to Hershey Company's famous YORK mark, and is used for chocolate confectionery products, defendant's sale of YORKIE products inevitably will cause confusion among consumers as to the origin, source or sponsorship of defendant's YORKIE product.

44.     In addition, the YORKIE mark is likely to dilute the distinctive quality of the famous YORK mark by lessening its capacity to identify and distinguish Hershey Company's products.

45. Defendant's acts are causing and will continue to cause damage and irreparable harm to Hershey Company and the valuable reputation and goodwill of its licensed marks with purchasers and consumers.

**Hershey's Exclusive Rights to Use the MALTESER Mark**

46. Since as early as 1961, Hershey and its predecessors-in-interest have used the distinctive trademark MALTESER in connection with chocolate-covered malted milk ball candy products.

47. Hershey owns incontestable, valid, subsisting and existing United States trademark registrations for the MALTESER mark (Reg. No. 761,679) and for a stylized version of the MALTESER mark (Reg. No 1,923,905) for use in connection with "candy." Copies of the certificates for the foregoing federal registrations are attached as **Exhibit F**.

48. The MALTESER mark has been used in the United States for more than 52 years in connection with chocolate-covered malted milk ball candy products in the United States.

49. Through substantial sales, marketing and use of the MALTESER mark in the United States, the MALTESER mark has become distinctive of Hershey's products in the United States, and has come to identify and indicate the source of those products to consumers and the trade.

50. In light of the distinctiveness of the MALTESER mark, Hershey's

sales and use of the mark, and Hershey's federal registrations pertaining to the

mark, Hershey owns the exclusive right to use the word MALTESER, or any term

substantially similar thereto or derivative thereof, in connection with candy

products throughout the United States.

### Defendant's Infringement of the MALTESER Mark

51.     Defendant sells chocolate-covered malted milk ball candy products in

the United States under the brand name MALTESERS.

52.     On information and belief, defendant imports these infringing

products into the United States and offers them for sale through, inter alia, its sales

offices and catalogs.  On information and belief, defendant also advertises and sells

its MALTESERS products through its website (www.lbbimports.com).

53.     The MALTESERS products that defendant sells in the United States

are not manufactured or authorized by Hershey.  Indeed, defendant has never been

authorized by Hershey or its affiliates to use the MALTESER mark, the

MALTESERS mark, or any variant thereof, in connection with candy or any other

product.

54.     Defendant's MALTESERS mark is merely the plural form of

Hershey's registered mark MALTESER, and is used by defendant in connection

with an extremely similar product.

55.     Accordingly, defendant's sale of candy under its MALTESERS mark

inevitably will cause confusion among consumers as to the origin, source or sponsorship of the products offered by defendant, and cause many potential purchasers to mistakenly believe that the products are the same as those offered by Hershey, or that they are in some way authorized or licensed by the source of the MALTESER brand.

56.     Defendant's acts are causing and will continue to cause damage and irreparable harm to Hershey and the valuable reputation and goodwill of its marks with purchasers and consumers.

### Hershey's Exclusive Right to Use the CADBURY Mark and the CADBURY Trade Dress for Chocolate Products in the United States

57.     The well-known and famous CADBURY brand of chocolate candy was introduced in the United Kingdom in approximately 1855.  For a quarter of a century, since 1988, Hershey has manufactured and sold chocolate products bearing the CADBURY mark in the United States.

58.     Hershey Company owns an exclusive license (even as to the licensor) to use the famous registered trademark CADBURY in the United States in connection with, among other things, chocolate candy.  Hershey Company's licensor, Cadbury UK Limited Corporation ("Cadbury UK"), owns incontestable, valid, subsisting and existing United States trademark registrations covering the famous CADBURY mark and logos, including Registration No. 65,081 covering CADBURY for "chocolate"; Registration No. 230,468 covering CADBURY for,

17

*inter alia*, "chocolate candy"; Registration No. 977,811 covering CADBURY for, *inter alia*, "candy"; and Registration No. 1,107,458 covering a stylized version of the CADBURY mark for, *inter alia*, "chocolate" and "chocolates and non-medicated confectionery."  Cadbury UK also owns incontestable, valid, subsisting and existing United States trademark registrations covering the names of various candy bars sold under the CADBURY brand, including CARAMELLO (Reg. Nos. 771,569 and 2,962,010) and DAIRY MILK (Reg. Nos. 1,403,327, 2,942,301 and 4,224,494).  Cadbury UK also owns an incontestable, valid, subsisting and existing United States trademark registration covering a design that appears on the packaging of some milk-chocolate varieties of CADBURY products, which depicts milk being from one full glass on the left and one half glass on the right (the "glass and a half" design) (Reg. No. 1,460,259).  Copies of the certificates of registration for the foregoing federal registrations are attached as **Exhibit G**.

59.     Hershey Company also owns an exclusive license (even as to the licensor) to use the distinctive trade dress associated with the CADBURY mark (the "CADBURY Trade Dress").  The CADBURY Trade Dress features, *inter alia*, a purple and gold color scheme, the distinctive CADBURY stylized script (typically in gold) including the large spiral "C" and the mirror-image design of the "d" and "b," and, on some milk-chocolate varieties of CADBURY products, the "glass and a half" design.  Cadbury UK also owns incontestable, valid, subsisting

and existing United States trademark registrations covering the "glass and a half" design (Reg. No. 1,460,259).  Representative images of product packaging embodying the CADBURY Trade Dress are attached as **Exhibit H**.

60.     The CADBURY Trade Dress constitutes an arbitrary combination of arbitrary design elements, the overall appearance and the elements of which are nonfunctional and inherently distinctive.

61.     The CADBURY mark and the CADBURY Trade Dress have been extensively advertised and used throughout the United States for decades.  Hershey Company has spent tens of millions of dollars on advertising for CADBURY products (including CARAMELLO and DAIRY MILK products) that feature the CADBURY mark and the CADBURY Trade Dress, and retail sales of CADBURY chocolate products bearing those marks have exceeded half a billion dollars in the past five years alone.

62.     By virtue of Hershey's substantial sales, marketing and use of the CADBURY mark and the CADBURY Trade Dress throughout the United States in connection with the CADBURY family of products, the CADBURY mark and the CADBURY Trade Dress have become famous and well known, have become distinctive of Hershey's products, and have come to identify and indicate the source of Hershey's products to consumers and the trade.  Hershey has developed for itself and its CADBURY mark, CADBURY Trade Dress and CADBURY

family of products substantial goodwill and an excellent reputation among actual and potential purchasers and users of its products in the United States.

63.     Pursuant to the license agreement between Hershey Company and Cadbury UK, Hershey is expressly authorized to file suit in order to protect the marks that it licenses from Cadbury UK from infringement, dilution, unfair competition, or impairment in the United States.

## Defendant's Infringement and Dilution of the CADBURY Mark and the CADBURY Trade Dress

64.     Well after Hershey began using the CADBURY mark and the CADBURY Trade Dress in the United States, and after the CADBURY mark and the CADBURY Trade Dress had become famous in the United States, defendant commenced selling CADBURY chocolate products in the United States that are manufactured for sale outside of the United States by entities other than Hershey and that are not authorized by Hershey for sale in the United States.

65.     On information and belief, defendant imports its infringing CADBURY products into the United States and offers them for sale through, inter alia, its sales offices and catalogs.  On information and belief, defendant also advertises and sells its CADBURY products through its website (www.lbbimports.com).

66.     Defendant's CADBURY products bear marks that are identical to the registered CADBURY mark for which Hershey Company owns an exclusive

license in the United States.  In addition, many of defendant's CADBURY

products bear marks that are identical to the registered CARAMELLO or DAIRY

MILK marks, for which Hershey owns an exclusive license in the United States.

67.    Defendant's CADBURY products bear a trade dress that is essentially

identical to the distinctive and well-known CADBURY Trade Dress for which

Hershey Company owns an exclusive license.  Defendant's products bear the same

purple and gold color scheme, the same distinctive CADBURY stylized script in

gold type including the large spiral "C" and mirror-image design of the "d" and

"b," and the same "glass and a half" design on milk chocolate varieties.

68.    The CADBURY chocolate products that defendant sells in the United

States are not manufactured or authorized by Hershey.  Upon information and

belief, these products are manufactured by Hershey's licensor for sale in markets

outside of the United States and are not intended for sale within the United States.

Defendant has never been authorized by Hershey Company or its affiliates to use

the CADBURY mark or the CADBURY Trade Dress in connection with

chocolates or any other product in the United States.

69.    Defendant's imported CADBURY products are materially different

from Hershey Company's CADBURY products that are intended for sale in the

United States in a number of ways.  Among other differences, the packages for the

defendant's CADBURY products display non-U.S. contact information and often

bear nutritional information required by non-U.S. regulatory authorities.  In addition, defendant also sells some different varieties and configurations of CADBURY products than Hershey.

70.     Defendant's use of marks that are identical to the CADBURY mark, and a trade dress that is identical or nearly identical to the CADBURY Trade Dress, on chocolate products that are not manufactured, authorized, or approved by Hershey, and that are materially different than those intended by Hershey for sale in the United States, is likely to cause confusion among consumers as to the origin, source, or sponsorship of the defendant's CADBURY products.

71.     In addition, defendant's sale of CADBURY products is likely to dilute the distinctive quality of the CADBURY mark and the CADBURY Trade Dress by lessening their capacity to identify and distinguish Hershey Company's products.

72.     Defendant's acts are causing and will continue to cause damage and irreparable harm to Hershey Company and the valuable reputation and goodwill of its licensed marks with purchasers and consumers.

**Hershey's Exclusive Rights to Use the KIT KAT Mark and
the KIT KAT Trade Dress for Confectionery Products in the United States**

73.     The well-known and famous KIT KAT brand of chocolate-covered wafer confections was introduced in United Kingdom in approximately 1937.  For more than forty years, since 1979, Hershey Company has manufactured and sold confectionery products bearing the KIT KAT mark in the United States.

74.     Hershey Company owns an exclusive license (even as to the licensor) to use the famous registered mark KIT KAT in the United States in connection with, *inter alia*, the familiar chocolate-covered wafer confections.  Hershey Company's licensor, Société des Produits Nestlé S.A. ("Nestlé"), owns incontestable, valid, subsisting and existing United States trademark registrations for the KIT KAT mark (Reg. No. 1,022,181) and for a stylized version of the KIT KAT mark (Reg. No 1,535,582) for use in connection with "wafer fingers in milk chocolate."  Copies of the certificates of registration for the foregoing federal registrations are attached as **Exhibit I**.

75.     Hershey Company also owns an exclusive license to use the distinctive trade dress associated with KIT KAT products (the "KIT KAT Trade Dress").  The KIT KAT Trade Dress features a distinctive red-and-white color scheme and a distinctive stylized script, which includes two oversized "K"s that dwarf the other letters in the words "Kit" and "Kat," slanted typeface, and an oval shape that surrounds the term "Kit Kat."  Representative images of product packaging embodying the KIT KAT Trade Dress are attached as **Exhibit J**.

76.     The KIT KAT Trade Dress constitutes an arbitrary combination of arbitrary design elements, the overall appearance and the elements of which are nonfunctional and inherently distinctive.

77.     The KIT KAT mark and the KIT KAT Trade Dress have been

extensively advertised and used throughout the United States for decades.  Hershey Company has spent tens of millions of dollars on advertising for KIT KAT products that feature the KIT KAT mark and the KIT KAT Trade Dress in the past five years alone, and retail sales of KIT KAT products bearing the KIT KAT mark and the KIT KAT Trade Dress in that time period have exceeded one billion dollars.

78.     By virtue of Hershey's substantial sales, marketing and use of the KIT KAT mark and the KIT KAT Trade Dress throughout the United States in connection with Hershey's KIT KAT products, the KIT KAT mark and the KIT KAT Trade Dress have become famous and well known, have become distinctive of Hershey's products, and have come to identify and indicate the source of Hershey's products to consumers and the trade.  Hershey has developed for itself and its KIT KAT mark, KIT KAT Trade Dress and KIT KAT products substantial goodwill and an excellent reputation among actual and potential purchasers and users of its products.

79.     In light of the distinctiveness of the KIT KAT mark and the KIT KAT Trade Dress and the duration and extent of Hershey's sales, marketing and use of this mark throughout the United States, the KIT KAT mark and the KIT KAT Trade Dress are distinctive and famous among consumers in the State of Pennsylvania and throughout the United States.

80.    Pursuant to a license agreement between Hershey Company and Nestlé's predecessor-in-interest, Rowntree Mackintosh Limited, Hershey is expressly authorized to file suit in order to protect the marks that it licenses from Nestlé from infringement, dilution, or unfair competition in the United States.

## Defendant's Infringement and Dilution of the
## KIT KAT Mark and the KIT KAT Trade Dress

81.    Well after Hershey began using the KIT KAT mark and the KIT KAT Trade Dress in the United States, and after the KIT KAT mark and Trade Dress had become famous in the United States, defendant commenced selling KIT KAT-branded chocolate-covered wafer products in the United States that are manufactured for sale outside of the United States by entities other than Hershey and that are not authorized by Hershey for sale in the United States.

82.    On information and belief, defendant imports its infringing KIT KAT products into the United States and offers them for sale through, inter alia, its sales offices and catalogs.  On information and belief, defendant also advertises and sells its KIT KAT products through its website (www.lbbimports.com).

83.    Defendant's KIT KAT products bear the mark KIT KAT, which is identical to the registered mark KIT KAT owned by Hershey's licensor. Moreover, defendant's KIT KAT products use a stylized script that is nearly identical to the registered stylized KIT KAT mark, with a trade dress that is nearly identical to the KIT KAT Trade Dress.

25

84.    The KIT KAT products that defendant sells in the United States are not manufactured or authorized by Hershey.  Defendant has never been authorized by Hershey Company or its affiliates to use the KIT KAT mark or the KIT KAT Trade Dress in connection with chocolate-covered wafers or any other product.

85.    Defendant's imported KIT KAT products are materially different from Hershey Company's KIT KAT products that are intended for sale in the United States in a number of ways.  Among other differences, the packages for the defendant's KIT KAT products display non-U.S. contact information and often bear nutritional information required by non-U.S. regulatory authorities.

86.    Defendant's use of a mark that is identical to the registered mark KIT KAT, in a stylized form that is nearly identical to the stylized mark licensed by Hershey, with a trade dress that is nearly identical to the KIT KAT Trade Dress, on products that are not manufactured, authorized, or approved by Hershey, and that are materially different than those intended by Hershey for sale in the United States, is likely to cause confusion among consumers as to the origin, source, or sponsorship of the defendant's KIT KAT products.

87.    In addition, defendant's sale of KIT KAT products is likely to dilute the distinctive quality of the KIT KAT mark and the KIT KAT Trade Dress by lessening their capacity to identify and distinguish Hershey Company's products.

88.    Defendant's acts are causing and will continue to cause damage and

irreparable harm to Hershey Company and the valuable reputation and goodwill of its licensed marks with purchasers and consumers.

### Hershey's Exclusive Rights to Use the ROLO Mark and the Trade Dress for Confectionery Products in the United States

89.     The distinctive and famous ROLO brand of chocolate confections was introduced in United Kingdom in approximately 1937.  Since 1979, for over forty years, Hershey Company has manufactured and sold confectionery products bearing the ROLO mark in the United States.

90.     Hershey Company owns an exclusive license (even as to the licensor) to use the famous registered mark ROLO in the United States in connection with, *inter alia*, the familiar caramel-filled chocolates.  Hershey Company's licensor, Nestlé, owns incontestable, valid, subsisting and existing United States trademark registrations for the ROLO mark (Reg. No. 3,365,435) and for a stylized version of the ROLO mark (Reg. No. 363,472) for use in connection with "candy."  Copies of the certificates of registration for the foregoing federal registrations are attached as **Exhibit K**.

91.     Hershey Company also owns an exclusive license to use the distinctive trade dress associated with ROLO products (the "ROLO Trade Dress").  The ROLO Trade Dress features a cylindrical package bearing a distinctive red, brown, and gold scheme.  The word "ROLO" is featured prominently in thick, red lettering with thin white outlining, set against a brown background with gold foil

exposed at the ends of each cylinder.  An image of the distinctively-shaped ROLO product is set to the right of the large, red ROLO text.  An example of the distinctive ROLO Trade Dress, as it appears on one of Hershey's ROLO products, is set forth below:



92.    The ROLO Trade Dress constitutes an arbitrary combination of arbitrary design elements, the overall appearance and the elements of which are nonfunctional and inherently distinctive.

93.    The ROLO mark and Trade Dress have been extensively advertised and used throughout the United States for decades.  Hershey has spent tens of millions of dollars on advertising for its ROLO products in the United States over the past five years.  Hershey sells more than $100 million of ROLO products each year in the United States.

94.    By virtue of Hershey's substantial sales, marketing and use of the ROLO mark and the ROLO Trade Dress throughout the United States in connection with Hershey's ROLO products, the ROLO mark and the ROLO Trade Dress have become famous and well known, have become distinctive of Hershey's products, and have come to identify and indicate the source of Hershey's products to consumers and the trade.  Hershey has developed for itself and its ROLO mark,

ROLO Trade Dress and ROLO products substantial goodwill and an excellent reputation among actual and potential purchasers and users of its products.

95.     In light of the distinctiveness of the ROLO mark and the ROLO Trade Dress and the duration and extent of Hershey's sales, marketing and use of this mark throughout the United States the ROLO mark and the ROLO Trade Dress are distinctive and famous among consumers in the State of Pennsylvania and throughout the United States.

96.     Pursuant to a license agreement between Hershey Company and Nestlé's predecessor-in-interest, Rowntree Mackintosh Limited, Hershey is expressly authorized to file suit in order to protect the marks that it licenses from Nestlé from infringement, dilution, or unfair competition in the United States.

### Defendant's Infringement and Dilution of the ROLO Mark and the ROLO Trade Dress

97.     Well after Hershey began using the ROLO mark and the ROLO Trade Dress in the United States, and after the ROLO mark and the ROLO Trade Dress had become famous in the United States, defendant commenced selling ROLO-branded caramel-filled chocolate products in the United States that are manufactured for sale outside of the United States by entities other than Hershey and that are not authorized by Hershey for sale in the United States.

98.     On information and belief, defendant imports its infringing ROLO products into the United States and offers them for sale through, inter alia, its sales

offices and catalogs.  On information and belief, defendant also advertises and sells its ROLO products through its website (www.lbbimports.com).

99.    Defendant's ROLO products bear marks that are identical to the registered ROLO mark for which Hershey Company owns an exclusive license in the United States.

100.    Defendant's ROLO products bear a trade dress that is essentially identical to the distinctive and well-known ROLO Trade Dress for which Hershey Company owns an exclusive license.  Defendant's products bear the same brown, red and gold color scheme, and a highly similar red script with white outlining for the ROLO mark.

101.    An image of a ROLO product of the type sold by defendant is set forth below, beside an image of Hershey's ROLO product:



**Example of Hershey's ROLO product**    **Example of infringing ROLO product**

102.    The ROLO products that defendant sells in the United States are not manufactured or authorized by Hershey.  Defendant has never been authorized by Hershey Company or its affiliates to use the ROLO mark or the ROLO Dress in connection with caramel-filled chocolates or any other product.

103.    Defendant's imported ROLO products are materially different from

Hershey Company's ROLO products that are intended for sale in the United States in a number of ways.  Among other differences, the packages for the defendant's ROLO products display non-U.S. contact information and often bear nutritional information required by non-U.S. regulatory authorities.

104.   Defendant's use of a mark that is identical to the registered mark ROLO, in a stylized form that is nearly identical to the stylized mark licensed by Hershey, with a trade dress that is nearly identical to the ROLO Trade Dress, on products that are not manufactured, authorized, or approved by Hershey, and that are materially different than those intended by Hershey for sale in the United States, is likely to cause confusion among consumers as to the origin, source, or sponsorship of the defendant's ROLO products.

105.   In addition, defendant's sale of ROLO products is likely to dilute the distinctive quality of the ROLO mark and the ROLO Trade Dress by lessening their capacity to identify and distinguish Hershey Company's products.

106.   Defendant's acts are causing and will continue to cause damage and irreparable harm to Hershey Company and the valuable reputation and goodwill of its licensed marks with purchasers and consumers.

### Defendant's Acknowledgement of Its Infringement and Defendant's Agreement to Stop Importing the Infringing Products

107.   As set forth in detail below, defendant has been on notice of Hershey's objections to its sale of the Infringing Products since at least December

2012.  After months of delay cause by defendant's failure to offer a substantive response to Hershey's objections, defendant finally acknowledged that its activities infringed Hershey's trademark rights and promised to stop advertising and selling the Infringing Products in the United States, an agreement it has broken.

108.   Hershey's counsel first wrote to defendant on December 19, 2012, objecting to the sales of the Infringing Products and demanding that defendant cease and desist from infringing or diluting Hershey's valuable trademark rights in the Hershey Marks.  Hershey requested a response from defendant by January 9, 2013.  Hershey's letter was addressed to Mr. Nathan Dulley, who, on information and belief, was (and remains) the President of LBB.  A copy of this letter (without the voluminous exhibits thereto), along with the other written correspondence between the parties described below, is attached as **Exhibit L**.

109.   On or about January 14, 2013, Mr. Dulley left a voicemail for Hershey's counsel, requesting additional time to respond to Hershey's letter in light of Mr. Dulley's travel schedule.

110.   On February 14, 2013, having not heard further from Mr. Dulley, Hershey's counsel emailed Mr. Dulley, requesting a response "as soon as possible" in order to resolve the situation.  Still, Hershey received no response.

111.   Hershey's counsel wrote to defendant on June 28, 2013, reiterating objecting to defendant's important and sale of the Infringing Products.  Hershey

requested a response by July 15, 2013.

112.    On July 12, 2013, Mr. Dulley sent an email response to Hershey's counsel, requesting an extension of time to respond to Hershey's letter until August 2, 2013.  Hershey's counsel agreed to the extra time, but requested that defendant "confirm before then that [LBB was] agreeable in principle to stopping the objectionable sales."

113.    In a reply dated August 2, 2013, Mr. Dulley responded that "LBB does agree in principle to stopping the objectionable sales."  Mr. Dully also promised to provide more detailed response later that day.

114.    On August 7, 2013, Mr. Dulley sent another email to Hershey's counsel.  Mr. Dulley not only reiterated defendant's agreement to stop selling the Infringing Products, but admitted that the sale of those products infringed Hershey's rights:

> As previously stated in my email from Friday 8/02/2013, I agree in principle to stop what Hershey considers to be objectionable sales, and ***agree there is indeed an element of infringement*** to the majority of what was brought forth in your letter.

(Emphasis added).  In his email, Mr. Dulley went on to state that there was a large demand for imported CADBURY products and proposed that LBB be permitted to import CADBURY products from outside the United States in exchange for paying a royalty to Hershey.

115.   After receiving Mr. Dulley's August 7, 2013 email, Hershey obtained an electronic copy of defendant's Christmas 2013 catalog.  The catalog contained dozens of pages with advertisements for imported CADBURY, MALTESERS, YORKIE and ROLO products.  The metadata for the document suggests that it was created on or about June 21, 2013—well after Hershey first objected to the sale of the Infringing Products.  On information and belief, defendant continued to distribute its Christmas 2013 catalog during the month of August 2013, even after agreeing to stop selling the Infringing Products.  A copy of excerpts from defendant's Christmas 2013 catalog is attached as **Exhibit M**.

116.   Hershey's counsel responded by email on August 27, 2013, rejecting defendant's proposal to import CADBURY products under a royalty agreement. Hershey's counsel stated that Hershey "appreciated [LBB's] agreement in principle to stop importing to products to which Hershey previously objected."  Hershey also expressed concerns that defendant's distribution of the Christmas 2013 catalog "raise[d] serious questions as to whether [LBB was] giving this matter the serious attention that it deserves."

117.   On September 9, 2013, Mr. Dulley emailed Hershey's counsel, stating that he would provide a more fulsome response the following day.  He reiterated defendant's agreement to stop its infringing sales:  "Bottom line – we'll stop Cadbury sales that infringe on Hershey business."

118.   On Septembers 11, 2013, Mr. Dulley sent another email to Hershey's counsel, again confirming defendant's agreement to stop selling the Infringing Products:  "This email confirms that LBB will stop all distribution and sales in the US of the CADBURY, KIT KAT, ROLO, MALTESERS, YORKIE and TOFFEE CRISP products to which Hershey objects."

119.   On September 13, 2013, Hershey's counsel responded by thanking defendant for its agreement to stop importing the Infringing Products.

120.   On October 10, 2013, Mr. Dulley emailed Hershey's counsel, again requesting a licensing arrangement where defendant would be permitted to import the Infringing Products if it paid a royalty to Hershey.

121.   On October 23, 2013, Hershey's counsel responded that Hershey was not interested in any such arrangement, enclosing a proposed letter agreement to memorialize the agreement reached by the parties:

> While I appreciate your effort to find some other solution to this matter, we trust that LBB will abide by its prior agreement to cease sale in the United States of these products (and the other imported products that I have identified as violating Hershey's rights in the U.S.).  To that end, while I understand that we have an agreement that LBB Imports is stopping these sales in exchange for Hershey not pursuing further action, I enclose a more formal letter to memorialize that agreement.

122.   Neither Mr. Dulley nor anyone else at LBB responded to the October 23, 2013 email from Hershey's counsel.

35

123.   In consideration for defendant's unambiguous promise to stop importing and selling within the United States the Infringing Products, Hershey refrained from taking additional steps to protect its valuable trademark rights, such as filing a lawsuit against defendant for trademark and trade dress infringement, trademark and trade dress dilution, false designation of origin and unfair competition.

**Defendant's Breach of Its Agreement With Hershey and
Its Continued Bad-Faith Infringement of Hershey's Trademark Rights**

124.   It has come to Hershey's attention that defendant either never stopped or has resumed its infringing activity, in violation of its promises to Hershey to stop such activity.  Defendant's actions, as described below, indicate that it pursued such infringing activity in bad faith and in willful disregard of Hershey's trademark rights.

125.   Prior to January 2013, defendant's seasonal catalogs were available on its website (www.lbbimports.com) for download by the general public.  Indeed, Hershey attached pages from defendant's Spring & Summer 2013 catalog in its initial letter to defendant dated December 19, 2012.

126.   Sometime between January 2013 and August 2013, after receiving Hershey's December 19, 2012 letter, defendant made changes to its website so that only users with login credentials are able to download defendant's seasonal catalogs.

127.   On information and belief, defendant modified its website specifically to prevent Hershey from monitoring defendant's compliance with its agreement to stop selling the Infringing Products in the United States.

128.   After defendant agreed to stop selling the Infringing Products in the United States, it posted an Easter 2014 catalog to its website.  However, because Hershey's counsel lacked login credentials, Hershey was unable to monitor defendant's compliance with the parties' agreement.

129.   Hershey recently obtained an electronic copy of defendant's "Holiday Catalog 2014."  The metadata for the document suggests that it was created on or about June 18, 2014—approximately 18 months after Hershey first objected to the sale of the Infringing Products and more than 10 months after defendant agreed to stop such sales.

130.   In clear breach of its agreement with Hershey, defendant's Holiday Catalog 2014 contains page after page of advertisements for imported CADBURY, MALTESERS, KIT KAT and ROLO products—the same products that defendant promised to stop importing and selling in the United States.  Copies of excerpts from the catalog are attached as **Exhibit N**.

131.   In addition, defendant's website continues to advertise imported TOFFEE CRISP, YORKIE, KIT KAT and ROLO products, despite defendant's agreement more than a year ago to stop selling such products.  A copy of the

"Confectionary" page from defendant's website is attached as **Exhibit O**.

## FIRST CLAIM FOR RELIEF

### Infringement of Federally Registered Marks
### Under Section 32 of the Lanham Act, 15 U.S.C. § 1114

132.   Plaintiffs repeat and reallege paragraphs 1 through 131 of this complaint as if fully set forth herein.

133.   This claim is for the infringement of trademarks registered in the United States Patent and Trademark Office, pursuant to Section 32 of the Lanham Act, 15 U.S.C. § 1114, as amended.

134.   The marks used by defendant, as described above, are confusingly similar to, and are colorable imitations of, the federally registered REESE'S Orange Mark (Reg. No. 2,256,226), the federally registered elements of the REESE'S Trade Dress (Reg. No. 925,609; 3,631,320; 4,082,204; 4,082,215; 4,082,217; 4,093,052; 4,101,179; 4,120,422; 4,152,566; 4,155,499; 4,256, 316; and 4,330,229); the federally registered YORK mark (Reg. Nos. 564,557 and 1,644,557), the federally registered MALTESER mark (Reg. Nos. 761,679 and 1,923,905), the federally registered CADBURY mark; (Reg. Nos. 65,081; 230,468; 977,811; and 1,107,458); the federally registered CARAMELLO mark (Reg. Nos. 771,569 and 2,962,010); the federally registered DAIRY MILK mark (Reg. Nos. 1,403,327; 2,942,301; and 4,224,494); the federally registered "glass and a half" design mark (Reg. No. 1,460,259); the federally registered KIT KAT mark (Reg.

Nos. 1,022,181 and 1,535,582); and the federally registered ROLO mark (Reg. Nos. 3,365,435 and 363,472), and infringe those respective federally registered trademarks.

135.   Defendant's unauthorized use of the aforementioned marks is likely to cause confusion and mistake and to deceive the public as to the approval, sponsorship, license, source or origin of defendant's products.

136.   On information and belief, defendant's acts of trademark infringement have been done willfully and deliberately, and defendant has profited and been unjustly enriched by sales that defendant would not otherwise have made but for its unlawful conduct.

137.   Defendant's willful and deliberate acts described above have caused injury and damages to plaintiffs, and have caused irreparable injury to plaintiffs' goodwill and reputation, and, unless enjoined, will cause further irreparable injury, whereby plaintiffs have no adequate remedy at law.

## SECOND CLAIM FOR RELIEF

**Trademark and Trade Dress Infringement,
False Designation of Origin and Unfair Competition
Under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)**

138.   Plaintiffs repeat and reallege paragraphs 1 through 137 of this complaint as if fully set forth herein.

139.   This claim is for trademark and trade dress infringement, false

designation of origin, and unfair competition in violation of Section 43(a) of the
Lanham Act, 15 U.S.C. § 1125(a).

140.   By its unauthorized use of the marks and trade dresses described
above, defendant has (i) infringed the REESE'S Orange Mark, the REESE'S Trade
Dress, the YORK mark, the MALTESER mark, the CADBURY mark, the
CADBURY Trade Dress, the KIT KAT mark, the KIT KAT Trade Dress, the
ROLO mark and the ROLO Trade Dress; (ii) falsely designated the origin of its
products; and (iii) competed unfairly with plaintiffs, all in violation of Section
43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

141.   On information and belief, defendant's acts of trademark
infringement, trade dress infringement, false designation of origin and unfair
competition have been done willfully and deliberately, and defendant has profited
and been unjustly enriched by sales that it would not otherwise have made but for
its unlawful conduct.

142.   Defendant's willful and deliberate acts described above have caused
injury and damages to plaintiffs, and have caused irreparable injury to plaintiffs'
goodwill and reputation, and, unless enjoined, will cause further irreparable injury,
whereby plaintiffs have no adequate remedy at law.

## THIRD CLAIM FOR RELIEF

### Trademark and Trade Dress Dilution
### Under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c)

143.    Plaintiffs repeat and reallege paragraphs 1 through 142 of this complaint as if fully set forth herein.

144.    This claim is for the dilution of trademarks and trade dress, pursuant to Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

145.    The REESE'S Orange Mark, the REESE'S Trade Dress, the YORK mark, the CADBURY mark, the CADBURY Trade Dress, the KIT KAT mark, the KIT KAT Trade Dress, the ROLO mark and the ROLO Trade Dress are each distinctive and famous within the meaning of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), and were distinctive and famous prior to the date of defendant's conduct challenged herein.

146.    Defendant's conduct, as described above, is likely to dilute and is diluting the distinctive quality of the famous REESE'S Orange Mark, REESE'S Trade Dress, YORK mark, CADBURY mark, CADBURY Trade Dress, KIT KAT mark, KIT KAT Trade Dress, ROLO mark and ROLO Trade Dress, in that defendant's challenged marks are likely to create and have created an association between defendant's marks and the famous REESE'S Orange Mark, REESE'S Trade Dress, YORK mark, CADBURY mark, CADBURY Trade Dress, KIT KAT mark, KIT KAT Trade Dress, ROLO mark and ROLO Trade Dress, which impairs

the distinctiveness of those famous marks and lessens the capacity of those famous marks to identify and distinguish products marketed and sold by plaintiffs under those marks.

147.   On information and belief, defendant's acts of trademark dilution have been done willfully and deliberately and defendant has profited and been unjustly enriched by sales that defendant would not otherwise have made but for its unlawful conduct.

148.   Defendant's willful and deliberate acts described above have caused injury and damages to plaintiffs, and have caused irreparable injury to plaintiffs' goodwill and reputation, and, unless enjoined, will cause further irreparable injury, whereby plaintiffs have no adequate remedy at law.

## FOURTH CLAIM FOR RELIEF

### Trademark and Trade Dress Dilution
### Under 54 Pa. Cons. Stat. Ann. § 1124

149.   Plaintiffs repeat and reallege paragraphs 1 through 148 of this complaint as if fully set forth herein.

150.   This claim is for dilution of trademarks and injury to business or reputation under 54 Pa. Cons. Stat. Ann. § 1124.

151.   The REESE'S Orange Mark, the REESE'S Trade Dress, the YORK mark, the CADBURY mark, the CADBURY Trade Dress, the KIT KAT mark, the KIT KAT Trade Dress, the ROLO mark and the ROLO Trade Dress are each

famous marks in the Commonwealth of Pennsylvania within the meaning of 54 Pa. Cons. Stat. Ann. § 1124, and were famous prior to the date of defendant's adoption and use of similar designs on packages and in advertising for its candy products.

152.   Defendant's conduct, as described above, is diluting and will dilute the distinctive quality of Hershey's famous REESE'S Orange Mark, REESE'S Trade Dress, YORK mark, CADBURY mark, CADBURY Trade Dress, KIT KAT mark, KIT KAT Trade Dress, ROLO mark and ROLO Trade Dress, thereby lessening the capacity of those marks to identify and distinguish products marketed and sold by plaintiffs under those marks.

153.   On information and belief, defendant's acts of trademark dilution have been done willfully and deliberately and defendant has profited and been unjustly enriched by sales that defendant would not otherwise have made but for its unlawful conduct.

154.   Defendant's acts described above have caused injury and damages to plaintiffs, and have caused irreparable injury to plaintiffs' goodwill and reputation and, unless enjoined, will cause further irreparable injury, whereby plaintiffs have no adequate remedy at law.

## FIFTH CLAIM FOR RELIEF

### Common Law Trademark Infringement and Unfair Competition

155.   Plaintiffs repeat and reallege paragraphs 1 through 154 of this

complaint as if fully set forth herein.

156.   This claim is for trademark infringement and unfair competition in violation of the common law of the State of Pennsylvania.

157.   Defendant's use of its infringing marks and trade dress, as described above, constitutes common law trademark infringement, passing off, and unfair competition in violation of common law.

158.   On information and belief, defendant's acts of common law trademark infringement, passing off, and unfair competition have been done willfully and deliberately, and defendant has profited and been unjustly enriched by sales that defendant would not otherwise have made but for its unlawful conduct.

159.   Defendant's willful and deliberate acts described above have caused injury and damages to plaintiffs and have caused irreparable injury to plaintiffs' goodwill and reputation, and, unless enjoined, will cause further irreparable injury, whereby plaintiffs have no adequate remedy at law.

## SIXTH CLAIM FOR RELIEF

### Breach of Contract and Promissory Estoppel

160.   Plaintiffs repeat and reallege paragraphs 1 through 159 of this complaint as if fully set forth herein.

161.   This claim is for breach of contract and promissory estoppel in violation of the common law of the Commonwealth of Pennsylvania.

162.   As set forth above, defendant agreed in writing with Hershey to cease its importation and sale in the United States of TOFFEE CRISP, YORKIE, MALTESERS, CADBURY, KIT KAT and ROLO products that are manufactured outside of the United States by entities other than Hershey and that are not authorized by Hershey for sale within the United States.  In consideration for defendant's promise, Hershey did not pursue its prior claims against defendant for trademark and trade dress infringement, trademark and trade dress dilution, unfair competition and other violations of Hershey's rights.

163.   Pursuant to defendant's written promises in August 2013, defendant was legally and contractually bound to refrain from importing and selling in the United States of TOFFEE CRISP, YORKIE, MALTESERS, CADBURY, KIT KAT and ROLO products that are manufactured outside of the United States by entities other than Hershey.

164.   Defendant breached its obligations under the parties' agreement by continuing or resuming its importation and sale in the United States of TOFFEE CRISP, YORKIE, MALTESERS, CADBURY, KIT KAT and ROLO products that are manufactured outside of the United States by entities other than Hershey.

165.   Plaintiffs have fully performed all of their obligations under the parties' agreement.

166.   Defendant's acts described above have caused injury and damages to

plaintiffs, and have caused irreparable injury to plaintiffs' goodwill and reputation and, unless enjoined, will cause further irreparable injury, whereby plaintiffs have no adequate remedy at law

## PRAYER FOR RELIEF

**WHEREFORE**, Hershey prays that this Court enter judgment against defendant as follows:

A.      Granting preliminary and permanent injunctive relief restraining defendant, its officers, directors, agents, employees, servants, attorneys, successors, assigns and others controlling, controlled by or affiliated with defendant and all those in privity or active concert or participation with any of the foregoing (including without limitation each importer, distributor or reseller of defendant's products), and all those who receive actual notice by personal service or otherwise:

> i.      from using in any media, for any purpose (including, without limitation, importing, distributing, advertising or selling), (a) the REESE'S Trade Dress, the REESE'S Orange Mark, the TOFFEE CRISP trade dress, or any other mark or trade dress confusingly similar to or dilutive of the REESE'S Trade Dress or the REESE'S Orange Mark; (b) the YORK mark, the YORKIE mark, or any other mark confusingly similar to or dilutive of the YORK mark; (c) the MALTESER mark, the

MALTESERS mark or any other mark confusingly similar to the MALTESER mark; (d) the CADBURY mark, the CADBURY Trade Dress, the CARAMELLO mark, the DAIRY MILK mark or any other mark or trade dress confusingly similar to or dilutive of the CADBURY mark, the CADBURY Trade Dress, the CARAMELLO mark or the DAIRY MILK mark; (e) the KIT KAT mark, the KIT KAT Trade Dress, or any other mark or trade dress confusingly similar to or dilutive of the KIT KAT mark or the KIT KAT Trade Dress; or (f) the ROLO mark, the ROLO Trade Dress, or any other mark or trade dress confusingly similar to or dilutive of the ROLO mark or the ROLO Trade Dress; except in connection with genuine REESE'S, YORK, MALTESER, CADBURY, KIT KAT or ROLO products manufactured or authorized by Hershey for sale in the United States; and

ii.     from otherwise competing unfairly with plaintiffs;

B.     Ordering that defendant be adjudged to have violated Sections 32, 43(a), and 43(c) of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), and 1125(c), to have caused trademark dilution and business injury in violation of 54 Pa. Cons. Stat. Ann. § 1124, to have committed acts of common-law trademark infringement and unfair competition, and to have breached its contract with plaintiffs;

C.     Ordering an accounting of all gains, profits, savings and advantages

realized by defendant from its aforesaid acts of trademark and trade dress infringement, trademark and trade dress dilution, false designation of origin, and unfair competition, and awarding treble profits pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a), on the ground that defendant engaged in its wrongful acts with knowledge or bad faith or under other circumstances warranting treble profits;

D.     Awarding such damages as plaintiff shall establish in consequence of defendant's aforesaid acts of trademark and trade dress infringement, trademark and trade dress dilution, false designation of origin, and unfair competition, together with appropriate interest thereon, including three times the amount found as actual damages by the trier of fact to properly compensate plaintiff for its damages, pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a), and 54 Pa. Cons. Stat Ann. §§ 1123 and 1125.

E.     Ordering defendant to pay for and cause to be disseminated corrective advertising to ameliorate the adverse consequences of defendant's acts of trademark infringement and dilution, false designation of origin and unfair competition, the content, nature, form and extent of which is to be approved by plaintiff and this Court;

F.     Ordering defendant to recall from all chains of distribution all goods, product packaging, product displays, promotional materials, advertisements, commercials, infomercials and other items, the dissemination by defendant of which would violate the injunction herein requested;

G.     Ordering defendant to deliver up for destruction any and all goods,

48

product packaging, product displays, promotional materials, advertisements, commercials and other items in the possession, custody or control of defendant which, if sold, displayed, or used, would violate the injunction herein granted, and to disable all websites to the extent they contain any content, the display or use of which would violate the injunction herein requested;

H.      Ordering defendant to pay for and cause to be disseminated to each distributor and reseller of defendant's candy products a notice advising said persons of defendant's acts of trademark infringement and dilution, false designation of origin, unfair competition and breach of contract, and advising of the issuance and content of the injunction herein requested;

I.      Ordering that, pursuant to Section 34(a) of the Lanham Act, 15 U.S.C. § 1116(a), defendant shall serve upon plaintiff within thirty (30) days after service on defendant of an order granting an injunction, or such extended period as the Court may direct, a report in writing under oath setting forth in detail the manner and form in which defendant has complied with the injunction;

J.      Awarding plaintiff its costs and expenses of this action;

K.      Declaring that this is an exceptional case pursuant to Section 35 of the Lanham Act, 15 U.S.C. § 1117, because of the willful and deliberate nature of defendant's acts of trademark and trade dress infringement, trademark and trade dress dilution, false designation of origin, and unfair competition, and awarding plaintiff its reasonable attorneys' fees;

L.      Declaring that defendant committed its wrongful acts with knowledge or bad faith or under circumstances otherwise warranting attorneys'

fees under 54 Pennsylvania Cons. Stat Ann. §§ 1123 and 1125, and awarding plaintiffs their reasonable attorneys' fees; and

M.     Awarding plaintiff punitive damages in an amount to be determined by the trier of fact for defendants' willful and knowing trademark infringement and unfair competition, pursuant to the common law; and

N.     Granting such other and further relief as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all triable issues.

Dated:  August 25, 2014                    Respectfully submitted,


                                           By  /s/ Devin Chwastyk
                                           Harvey Freedenberg (PA 23152)
*Of Counsel:*                              hfreedenberg@mwn.com
                                           Devin Chwastyk (PA 91852)
                                           dchwastyk@mwn.com
                                           MCNEES, WALLACE & NURICK LLC
Paul C. Llewellyn                          100 Pine Street, P.O. Box 1166
paul.llewellyn@kayescholer.com             Harrisburg, PA  17108-1166
Kyle D. Gooch                              Telephone:  (717) 237-5482
kyle.gooch@kayecholer.com                  Facsimile:   (717) 237-5300
KAYE SCHOLER LLP
425 Park Avenue                            *Attorneys for Plaintiffs The Hershey*
New York, NY  10022                        *Company and Hershey Chocolate &*
Telephone:  (212) 836-8000                 *Confectionery Corporation*
Facsimile:   (212) 836-8689